IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES ex rel. JOSEPH KASPER, et al., ) ) ) | |
| Plaintiffs, ) ) ) | No. 13 C 00220 |
| v. ) ) ) | Judge John J. Tharp, Jr. |
| BLACKHAWK MEDICAL TRANSPORTATION, et al. ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

This opinion addresses issues arising from a dysfunctional working relationship between two attorneys who filed a *quit tam* lawsuit asserting violations of the False Claims Act, 31 U.S.C. § 3730, in early 2013. The Court has issued two prior opinions relating to these issues; familiarity with those rulings is presumed. *See* Orders, ECF Nos. 35, 41. The short version of events leading up to this opinion is as follows.

On January 11, 2013, James H. Potts II and Edward Rueda filed a *qui tam* complaint asserting claims under the False Claims Act, 31 U.S.C. § 3730, and other related claims, on behalf of the United States and the states of Illinois, Indiana, and Wisconsin.[1] The gist of the claims in the original complaint was that the defendants falsely billed Medicare and Medicaid for ambulance transport services that were not medically necessary. In the complaint, Potts purported to be the "Relator" and alleged that he had "personal knowledge of the fraud and false records, statements and claims presented to the Government" by the defendants. Compl. ¶ 9,

---

[1] Mr. Potts has been a licensed attorney in Georgia since 1991. Mr. Rueda, by contrast, was admitted to the Illinois bar only in November 2011. At the time the complaint was filed, neither had been admitted to the Trial or General bars of this Court; both applied for and were granted admission to those bars on February 1, 2013.

ECF No. 2. The complaint also included attached affidavits of three current and former employees of the defendant companies ("the employee relators"). Although Rueda signed the original complaint, he did not file an appearance on behalf of Potts as relator or the employee-relators.

On August 21, 2013, Rueda filed a motion for leave to file an amended complaint. Mot., ECF No. 10. That motion alleged that Potts, Rueda's co-counsel, had no personal knowledge of the facts alleged in the original complaint but nevertheless had inappropriately inserted himself as the relator to the detriment of the employee relators, who did have personal knowledge of the facts asserted. According to Rueda, the employee relators initially brought their concerns about the company to him. Rueda, in turn, had referred the case to Potts on the strength of Potts' representations that he had expertise in handling False Claims Act cases. The proposed amended complaint itself did not differ from the original complaint, except that it named the three employee relators—Joseph Kasper, Robert Kasper, and Kimberly Staton (collectively, "the clients")—as the relators in the case (¶ 1), asserted that they (rather than Potts) have personal knowledge of the facts alleged (¶ 9), and omitted Potts as an attorney for the plaintiffs.

As filed, the motion for leave to file an amended complaint included a notarized certificate of service stating that Rueda served the motion on Potts and the United States Attorney for the Northern District of Illinois "by electronic mail and by depositing same with U.S. Mail." There was also a notice of motion directed to Potts and the U.S. attorney. Neither the certificate of service nor the notice of motion included the Attorneys General for Illinois, Indiana, or Wisconsin. Potts, however, claims that he never received notice of the motion to file an amended complaint, and the Assistant United States Attorney assigned to this case also confirmed that he did not receive notice of the proposed amended complaint. Both had

appearances on record and should have been receiving ECF notices, but at most they would have received notice of a "restricted" entry that is not viewable on the ECF system. Not surprisingly, then, no one objected to the motion to amend the complaint. Chief Judge Castillo granted the motion on August 28, 2013. Order, ECF No. 11.

The dispute between Potts and Rueda did not come to this Court's attention until the case had been reassigned from Chief Judge Castillo in November 2013, after the United States and the State Attorneys General all declined to intervene in the case (based on their evaluation of the original complaint and their discussions of the same with Potts). The Court held a status hearing on February 20, 2014, which was attended—telephonically—only by Potts (Rueda still had not filed an appearance in the case, and so did not receive the electronic notice setting the status hearing). At that time, Potts advised the Court that he intended to dismiss the case once he could review a number of pleadings that had been filed under seal by someone other than himself (although using Potts' own ECF account), which he had been unable to access on the electronic docket; Potts indicated that he believed that the pleadings had been filed by Rueda. After the status hearing, the Court obtained the pleadings filed under seal (and restricted) and discovered the motion for leave to amend and the ruling thereon. Accordingly, the Court scheduled a status hearing for March 12, 2014, to determine how Mr. Rueda had been able to file an amended complaint when he was not counsel of record for the plaintiffs.

At the March status hearing, upon learning that neither the United States nor the relevant states had received notice of the amended complaint, the Court directed Rueda to serve the amended complaint on the appropriate parties and extended the time in which they could evaluate whether to intervene in the case to March 15, 2015. The Court also expressed significant reservations about whether Potts or Rueda should be permitted to proceed in this

3

matter on behalf of the plaintiffs and directed Potts and Rueda, who hotly contested the facts underlying their respective claims to representation of the employee-relators in this case, to file affidavits setting forth their versions of the events in question.

Upon review of those submissions, the Court found (as relevant here) in its decision of July 8, 2014 (ECF No. 35) that:

- Potts does not have personal knowledge of the facts alleged in the complaint; the statement in the original complaint to that effect is false.

- Potts falsely represented to this Court that Mr. Rueda was not his law partner and had submitted on January 11, 2013, an affidavit in support of Mr. Rueda's application for admission to the General Bar of the United States District Court for the Northern District of Illinois attesting that "Edward Rueda is a partner in the law firm of James Hugh Potts II Trial Lawyers."

- Potts' assertion that the employee relators "requested" that he serve as the relator in their stead because they were concerned about maintaining their anonymity was not credible, because each of those witnesses had submitted an affidavit attesting that he or she was not seeking anonymity and was willing to testify regarding the information he or she had provided.

- Potts failed to fully advise the employee relators about potential conflicts of interest that he would face in serving both as the relator in the case and as attorney to each of them.

- The employee relators had unequivocally terminated their representation by Potts.

Based on these findings, the Court terminated Mr. Potts' appearance in this case as both attorney and putative relator. Mem. Op. 6, ECF No. 35. The Court also indicated that, based on Potts' intentional misrepresentations to the Court concerning his personal knowledge of the facts of the case and his partnership with Rueda, it would make a recommendation to the Court's Executive Committee that Mr. Potts be suspended from the Court's Trial Bar for a period of at least 12 months. *Id.* Because Mr. Rueda's conduct did not appear to involve any material

misrepresentations to the Court or other conduct in violation of ethical rules, the Court concluded that no similar action was necessary with respect to Mr. Rueda. *Id*. Nevertheless, based on its observation of Mr. Rueda's lack of familiarity with the Court's rules and procedures, the Court required (among other things) that another member of this Court's trial bar serve as co-counsel with Rueda for the duration of this case. *Id.*

Thereafter, Potts obtained counsel and moved for reconsideration of the Court's findings of "dishonesty" and several other aspects of its original order, Mot., ECF No. 40; the Court denied the motion. *See* Order, ECF No. 41. Potts' specific assertions and the Court's responses[2] are summarized below:

- Potts asserted that his statement in the original complaint in this matter that he has "personal knowledge of the fraud and false records, statements and claims presented to the Government," ¶ 9, was not false because "the term 'personal knowledge' as used in Complaint was intended to mean that he had sufficient knowledge for purposes of False Claims Act Complaints to serve as Relator under 31 U.S.C. § 3730(e)(4)(B)." Mot. 9-10, ECF No. 40.

    o The Court rejected that argument as not credible coming from an experienced attorney; as the Court noted, to say that one has "personal knowledge" means that one has knowledge based on his or her own experience; it does not mean "knowledge of facts that others have told me about and which I am authorized to convey in their stead." Order 1-2, ECF No. 41.

- Potts asserted that Rueda never was his law partner.

    o The Court rejected that claim, however, on the strength of the affidavit submitted to support Rueda's application to the General Bar of this Court, which stated that "Edward Rueda is a partner in the law firm of James Hugh Potts II Trial lawyers" and appeared to bear Potts' signature. Order 2, ECF No. 41. The Court stated: "Either Mr. Potts' representation in this case about Mr. Rueda's status as a partner was false, or his statement in support of Rueda's

---

[2] Potts also contended that the Court had denied him due process by making findings without an evidentiary hearing. The Court disagreed, but this question is moot in light of the subsequent evidentiary hearing that has been conducted.

> General Bar application about that status was false; both propositions cannot be true." *Id.* But because Potts' counsel represented that they had not been able to secure a copy of this document, the Court directed the Clerk of the Court to provide a copy of Rueda's application Potts' counsel.

- Potts asserted that the clients requested that he serve as relator. Potts argued that the employee relators must have wanted anonymity because that was the only benefit that their agreement with Potts gave them in exchange for giving Potts a 50 percent share of any recovery.

  o The Court rejected that contention because it missed the point (indeed, it could be construed to concede the point) that the employees attested that Potts had advised them that could remain anonymous if he assumed the role of relator. Such a representation would be fundamentally misleading. Order 3, ECF No. 41.

- Potts asserted that he had not "engaged in a conflict of interest." Potts maintained that he did not have an actual conflict of interest in serving as relator and as attorney to each of the employee relators.

  o The Court noted again that his argument missed the point. The Court did not find that Mr. Potts had an actual conflict of interest as relator and attorney, but rather that the arrangement posed a potential conflict of interest that needed to be disclosed to, and discussed with, his clients before they could intelligently waive any potential conflict. Order 3, ECF No. 41. Mr. Potts did not assert that he ever discussed any potential conflict of interest that his role as relator might create.

A month after the Court denied his motion for reconsideration, Potts filed a "supplement" to the motion—effectively, another motion to reconsider—based on his review of the affidavit bearing his signature that had been submitted in support of Rueda's application to join the Court's General Bar. Potts represented, in a sworn affidavit, the he "did not sign or authorize anyone to sign on my behalf the Affidavit of Sponsor that was apparently submitted as part of Rueda's application for admission to this court. The signature that appears on the Affidavit of Sponsor is not my signature." Potts Affidavit, ECF No. 44-3. Potts also included copies of his signature on court papers filed in other proceedings as further evidence that the signature above

his typewritten name on the affidavit was not genuine, and the Court's observations confirm that Potts' signatures are plainly dissimilar to the signature on the Affidavit of Sponsor.

Based on this submission, the Court conducted an evidentiary hearing over the course of three days (November 19, December 2, and December 15, 2014). Following the evidentiary hearing, the Court issued an order requiring Mr. Rueda to show cause why he why he should not be found to have knowingly submitted false information to the Court in support of his application to the General Bar of this Court on or about January 11, 2013. 12/15/14 Order, ECF No. 62. In addition to Mr. Rueda's submission in response to that order, Mr. Potts submitted a post-trial brief.

The show-cause order to Mr. Rueda was predicated on his submission of an Affidavit of Sponsorship in support of his application to be admitted to the General Bar of the Northern District of Illinois. The affidavit Rueda submitted purports to be a statement of Mr. Potts attesting, among other things, that Potts had known Rueda for "not less than two years." The uncontroverted testimony of both Mr. Rueda and Mr. Potts during the evidentiary hearing, however, was that Rueda and Potts had at that time only known each other for a few months, since approximately October 2012. Mr. Rueda specifically testified during the hearing:

> Q: All right. When did you – how long – this was submitted presumably somewhere on or about January 11th, 2013. How long had you known Mr. Potts at that time?
>
> A: Probably three months.

12/15/14 Tr. at 273. Also:

> Q: Mr. Rueda, when did you first meet Mr. Potts?
>
> A: I stated earlier sometime – probably sometime in October 2012. I believe I flew down to Atlanta.

* * *

Q: And that was the first time you met Mr. Potts?

A: Yes.

12/15/14 Tr. at 285.

Although he attempts to shift the blame for this misstatement to Mr. Potts, claiming that Potts told him the two-year period was a routine matter of convention, Mr. Rueda concedes that his submission of the Affidavit of Sponsorship was "false," "dishonest," and "totally inconsistent with his obligations as an attorney, admitted to practice in the State of Illinois, and before the Bar of this Court." Resp. ¶ 6, ECF.No. 65. The Court agrees. Unfortunately, however, the problem does not end there. In his response to the order to show cause, Mr. Rueda makes yet another claim concerning his acquaintance with Mr. Potts, specifically now asserting that he met Potts not in October 2012 but rather in December 2011. *Id*. ¶ 7. Rueda's response to the show-cause order offers no explanation for this inconsistency, so the Court can conclude only that Rueda has twice misled the Court about the length of his relationship with Mr. Potts (the first time in his application to the General Bar and the second either during his testimony at the evidentiary hearing or his representation in his response to the show-cause order).

The Court finds these misrepresentations to be material and disturbing. Not only do they call into question Mr. Rueda's qualification for membership in the Bar of this Court, they also materially undermine the credibility of the claims that he has lodged against Mr. Potts, as discussed further below. Mr. Rueda's willingness to mislead the Court in an effort to secure admission to its Bar, and to further his efforts to discredit Mr. Potts, constitutes a significant breach of his duty of candor to the Court (*see* IRPC 3.3(a)(1)) and warrants a meaningful sanction. In the Court's view, Mr. Rueda should be suspended from the Trial Bar of this Court for a period of one year, and the Court will forward that recommendation to the Executive

Committee for its consideration. In light of that recommendation, and on its own inherent supervisory authority to address misconduct in a case before it, the Court terminates Mr. Rueda's appearance in this case.[3]

Mr. Rueda's lack of credibility also bears on the Court's prior findings regarding Mr. Potts' conduct, most centrally on the question of whether Rueda and Potts formed a partnership. Apart from his own lack of credibility, there is substantial reason to question Mr. Rueda's claim that he and Mr. Potts formed a partnership—most significantly, perhaps, the tax returns that Mr. Rueda filed as a sole proprietorship. The Court need not resolve that question definitively, however, because the question here is not whether Potts and Rueda were in fact partners, but whether Mr. Potts, who denies that there was a partnership, nevertheless made the statement on the Affidavit of Sponsorship he purportedly signed that Rueda "is a partner in the law firm of James Hugh Potts II Trial Lawyers."

Mr. Potts has denied that the signature on the Affidavit of Sponsorship is his, and the signature is sufficiently different from other exemplars of Mr. Potts' signature that the Court is convinced that he did not sign the Affidavit. Mr. Rueda's claim to have no knowledge of who signed the Affidavit, moreover, by contrast, lacks credibility for at least two reasons. First, Rueda admits that he was the only person in Chicago who was involved in submitting the Affidavit; second, Rueda acknowledged that he filled out the Affidavit. The question of who signed the Affidavit, however, is of no import if Potts authorized its filing, and Rueda claims that Potts did so. That claim is supported by an email that Rueda sent to Potts, attaching the Affidavit

---

[3] Fittingly, in view of his general performance in this case, and perhaps anticipating the Court's action, Mr. Rueda failed to appear for the status hearing that this Court set—a month in advance— for April 14, 2016, and failed to notify the Court that he would not be able to attend and attempt to reschedule the hearing. Instead, an attorney who has not been retained by the relator-employees appeared and advised the Court that Mr. Rueda was on vacation but had contacted his firm about the possibility of taking on the case on behalf of the relators.

and asking Potts to review it. 1/11/13 Email, Relator Resp. Ex. C, ECF No. 51-1. Rueda received a response to that email, which was sent from Potts' email address that said, "Perfect." *Id.* Potts maintains, however, that he did not send this email and that someone from his office must have done so. He supplies no basis to believe that he had authorized anyone else to access his email account, however, much less to respond to emails on his behalf. Had someone done so, moreover, it is difficult to imagine that Potts would have acquiesced in the response of "Perfect" when, as he tells it, the statement was intolerably inaccurate.

There is further reason to question the sincerity of Mr. Potts' umbrage at the identification of Mr. Rueda as his partner. Even accepting that Rueda never actually became his partner, the evidence leaves no room to dispute that Potts and Rueda discussed that possibility. Nor can Potts claim that he never referred to Rueda as his partner; the evidence introduced by Mr. Rueda includes an email that Potts sent (he admits) to a lawyer who was looking for assistance in Chicago, referring the individual to "Ed Rueda, my partner in Chicago." Clearly, when it suited his purposes, Mr. Potts was not averse to describing Rueda as his partner. And given this fact, the Court does not credit Mr. Potts' protests that he would not have approved Rueda's Affidavit based on its misidentification of Rueda as his partner, particularly when that representation furthered the interests of both Rueda and Potts in filing the original complaint at the earliest opportunity. Both Potts and Rueda needed to be admitted to the Bar of this Court in order to file this case and the Court concludes that, although he did not sign the Affidavit, Mr. Potts authorized its filing. Accordingly, the Court denies again Mr. Potts' motion to reconsider its finding that he misrepresented Rueda's status as his partner. And on the basis of that finding, the Court will, as indicated previously, recommend to the Executive Committee that Mr. Potts be suspended from the Trial Bar of the Northern District of Illinois for a period of one year.

With regard to the issue of whether the three employee-relators requested that he serve as relator, Mr. Potts argues, on the basis of the similarity of the employee affidavits and some inconsistencies in their testimony, that the testimony of the employees should be disregarded because they were simply parroting whatever Mr. Rueda told them to say. The Court concludes, however, that the affiants were credible in their testimony and that the inconsistencies that Mr. Potts identifies were not material. Most importantly, each of the employees testified consistently that while he or she had concerns about potential repercussions if they filed a whistleblower lawsuit, they were nevertheless willing to go forward as named relators. Each also testified that it was Mr. Potts who suggested that he could preserve their anonymity by serving as the relator in the case and that they thought he could do so because the case would be sealed (whatever that meant to them).

Nevertheless, the Court concludes that the accounts of the employees reflect that they likely misunderstood what Mr. Potts told them regarding revelation of their identities during the course of the lawsuit. It is patent that the employee-relators could not maintain their anonymity during the course of the lawsuit, particularly when they were providing substantive affidavits in support of the complaint. It is difficult to credit, then, a claim that Potts assured them of anonymity going forward; any such claim would have proven false in very short order. Having heard, and reviewed, the testimony of the employee-relators, the Court is convinced that they simply misunderstood the nuance of what Mr. Potts told them regarding their ability to remain anonymous and the import of the initial sealing of the *qui tam* complaint during review by the relevant government officials. The Court therefore vacates its finding that Mr. Potts misled the employee-relators in this regard.

The employee-relators also testified, however, that Mr. Potts never discussed any potential conflicts of interest with them. The Court's concern in this regard has been focused on whether Mr. Potts disclosed any potential conflict he might have in assuming the role of relator. Mr. Potts' response on this issue has been limited to arguing that it is not impermissible for an attorney to serve as a relator and that there is no "inherent" conflict in doing so. As the Court has previously noted, that argument misses the point: an attorney has an ethical obligation to discuss potential conflicts of interest with clients in order to permit the clients to make an informed decision as to whether they wish to waive any potential conflict that may materialize. IRPC 1.7(b)(4). It cannot reasonably be disputed that serving as a relator in lieu of one's clients poses "a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer." IRPC 1.7(a)(2). To take only the most obvious potential conflict, in a case where there is no government intervention, the relator is authorized to conduct the litigation; by agreeing to let Potts serve as the relator, the employee-relators surrendered that authority to Potts, giving him the power, for example, to settle the case over their objections. Potts, whose principal interest in the case was remuneration (which is not itself problematic, of course), might have a very different view of attractive settlement terms than would the employee-relators, who had raised the claims in an effort to stop and expose what they believed to be unlawful conduct. That is unquestionably a potential conflict of interest, and a foreseeable one.[4]

---

[4] Indeed, a variation on this theme actually emerged in this case. During the evidentiary hearing, Mr. Potts testified that upon learning that Rueda had made filings in this case without Potts' knowledge, he brought the issue to the Court's attention because he "wasn't sure what to do about it, and, you know, I certainly didn't want to dismiss the case because that would impair these people's rights . . . ." 12/3/14 Tr. at 52:15-17. In fact, however, on Feb. 20, 2014, Potts appeared at the status hearing scheduled by the Court and advised the Court that he intended to dismiss the case, expressing no reservation whatsoever about impairing "these people's rights."

The employees' testimony that Potts did not discuss *any* potential conflicts with them is, however, inconsistent with the retention agreements they signed. Those agreements (see Potts' Hearing Ex. 16, as an example) expressly state, in paragraph 14, that "it has been explained" that representing multiple clients poses potential conflicts of interest. And in paragraph 1 of the agreement, it is expressly disclosed that in agreeing to Potts' role as "Relator/Lawyer," the clients were empowering Potts "to compromise the above stated claim." That disclosure addresses the principal concern the Court had identified with respect to this unusual arrangement. In view of these disclosures, the Court cannot completely credit the testimony of the employees on this point. While it is possible that the employees signed this agreement without reading, or understanding, it, the Court cannot conclude definitively that Mr. Potts failed to counsel the employees adequately about the disturbing and obvious potential conflicts arising from his role as "Relator/Lawyer." Accordingly, the Court vacates its finding to that effect.

Finally, there is the issue of Mr. Potts' claim, in the original complaint, that he had "personal knowledge of the fraud and false records, statements and claims presented to the Government by and for the defendants named herein." Compl. ¶ 9, ECF No. 2. Mr. Potts continues to defend this statement on the ground that an individual may serve as a *qui tam* relator without "direct" knowledge of the fraudulent conduct reported, but that argument continues to miss the point. Mr. Potts did not aver, in the complaint, that he was without "direct" knowledge of the alleged fraud but had been told about the fraud by others who had such direct knowledge; he claimed that he had "personal knowledge" of the facts. The Court finds it difficult to conceive that an attorney with more than 20 years of litigation experience, as Mr. Potts claims, would not

---

2/20/14 Tr. ("Q: [T]he plaintiff does not intend to go forward with this case? A: "That's correct, your Honor. We will not be able to. We will file a dismissal today . . . ."). This leaves the impression that, inexcusably, Potts attempted to dismiss the case without the approval of, or even notice to, his putative clients.

understand the import of a statement that one has "personal knowledge" of a fact. His contention that he had personal knowledge because the employee-relators had provided him with information is sophistry that renders the term meaningless.

That said, Mr. Potts' claim in the original complaint to have "personal knowledge" is so transparently inaccurate that the Court concludes, on further consideration, that Potts truly did not appreciate the implication of his use of the term "personal knowledge" in the context of a *qui tam* action. The Court cannot identify any motive that Mr. Potts would have to make such a misrepresentation, and the fact that in the complaint Mr. Potts also expressly identified himself as a "trial lawyer" and expressly referred to the employee-affidavits that were attached as exhibits to the complaint corroborates the Court's present impression that Potts was carelessly imprecise rather than intentionally deceptive. Accordingly, the Court vacates its finding that Mr. Potts' claim to have "personal knowledge" of the health care fraud alleged in the complaint constituted a deliberate misrepresentation.

\* \* \* \* \*

Based on the Court's findings that both Mr. Rueda and Mr. Potts are culpable for the submission of a false Affidavit of Sponsorship with respect to Mr. Rueda's application to this Court's General Bar, the Court recommends to the Executive Committee that each attorney's membership in the Trial Bar of this Court be suspended for a period of one year. In addition, for the reasons explained above, the Court, under its inherent authority to oversee the litigation of the cases over which it presides, terminates Mr. Rueda's appearance as one of the attorneys of record for the relators. Mr. Rueda is ordered to provide his clients, the employee-relators, with a copy of this opinion within 3 days of its issuance. A status hearing will be held on May 12, 2016,

at 9:00 a.m. Attorney George Pontikes, who remains counsel of record for the relators, must attend, unless he has been granted leave to withdraw prior to that date.[5]

Date: April 15, 2016

John J. Tharp, Jr.
United States District Judge

---

[5] Mr. Pontikes also failed to appear for the scheduled April 14, 2016 status hearing.